UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODERICK LOWE,

                Plaintiff,

                                    Case No. 10-11189

      v.                            Honorable Julian Abele Cook, Jr.

R.N. FLOSSIE ANDERSON, et al.,

                Defendants.

ORDER

      This is a civil rights action brought by Roderick Lowe, on behalf of the decedent, Robin Hackney. At the time of his death on December 15, 2005, Hackney was imprisoned at the Mound Correctional Facility in Detroit, Michigan. Nearly fifty defendants were sued on (1) state law claims of gross negligence, and/or wanton and willful misconduct and (2) violation of Hackney's Fourth, Fifth, Eighth, and Fourteenth Amendment rights under 42 U.S.C. § 1983.

      The matter before the court are several defendants' motions for summary judgment and judgment on the pleadings. On October 14, 2011, Defendant Radhika Kosaraju filed a motion for summary judgment and for judgment on the pleadings. (ECF 94). On October 14, 2011, Defendants Correctional Medical Services and Pharmacorr jointly filed a motion for summary judgment and for judgment on the pleadings. (ECF 97). A hearing on the motions was held on January 17, 2012 at 9:30 a.m.

I.

      Robin Hackney was a former inmate incarcerated in the custody of the Michigan Department of Corrections during all of the times that are relevant to this litigation. (ECF 94, Ex. A, p.430).

From December 20, 1999 until December 13, 2004, Hackney was incarcerated at the St. Louis Correctional Facility. (ECF 94, Ex. A, p.394). On December 13, 2004, Hackney was transferred to the Mound Correctional Facility in Detroit, where he remained incarcerated until his death on December 15, 2005. (ECF 94, Ex. A, p.394; Ex. B pp.41-42).

Defendant Radhika Kosaraju, M.D., is a former independent contractor of Correctional Medical Services. Dr. Kosaraju worked at the Mound Correctional Facility as a medical service provider from approximately November of 2004 until July 1, 2005. (ECF 94, Ex. C). In her capacity as a medical provider she gave certain primary care services to the inmates incarcerated at the Mound Correctional Facility. (ECF 94, Ex. C).

Another Defendant, Correctional Medical Services (CMS) is a Missouri corporation that entered into a contract with the State of Michigan to provide medical services at some of the Michigan correctional facilities. (ECF 70, ¶17). By virtue of its contract with the State of Michigan, CMS provided primary care services in 43 facilities of Michigan's Department of Corrections. (ECF 105, Ex. 4, p.9).  In particular, CMS was contracted to provide primary medical care to inmates incarcerated at the St Louis and Mound Correctional Facilities while Hackney was incarcerated. (ECF 105, Ex. 4, 17-18). Dr. Kosaraju was an employee for CMS. Id. In June of 2005, CMS stopped providing primary care services at the Mound Facility. (*Id.*, p. 20).

At some point in early to mid-2004, when he was incarcerated at the St. Louis Correctional Facility, Hackney began to develop elevated blood pressure and headaches. In May of 2004, Hackney saw Dr. Snow who diagnosed him with hypertension and prescribed him 10mg of Vasotec to be taken every day for 30 days with six refills. (ECF 94, Ex. B, pp. 58-9).  Dr. Snow later prescribed an increased dosage of 20 mg of Vasotec to be taken every morning for 30 days with four

refills. (ECF 94, Ex. B. p.123).

On June 16, 2004, Hackney was seen by nursing and had an elevated blood pressure. (ECF 94, Ex. B, p.54). Dr. Snow was contacted and prescribed .2mg of Catapres to be taken as necessary to control his blood pressure. (ECF 94, Ex. B, p.54). On August 17, 2004, Dr. Snow saw Hackney for a Cardiovascular Chronic Care Clinic. (ECF 94, Ex. B, p.52). Dr. Snow diagnosed Hackney with mild hypertension that was fairly controlled and stable. *Id*. Dr. Snow also noted that Hackney was in compliance with his medication, diet, and lifestyle. Dr. Snow continued Hackney's Vasotec prescription and started him on Norvasc 5mg to be taken every morning for 30 days with four refills. (ECF 94, Ex. B, p.122). Hackney's prescription was filled on August 18, 2004 and refilled on September 23, 2004. (Docket Entry 94, Ex. B, p. 122). In August of 2004, Dr. Snow discovered that Hackney was also suffering from a low thyroid level and placed him on the medication Synthroid. (ECF 108, Ex. 8, p. 3).

On September 24, 2004, Hackney was brought to health care because he was feeling nauseated and dizzy. Hackney was seen by Dr. Snow who found he was suffering from low blood pressure. Dr. Snow temporarily discontinued the Vasotec. (ECF 94, Ex. B p.47, 121). On September 27, 2004 Dr. Snow had a follow-up appointment with Hackney. At that appointment, Dr. Snow determined that Hackney's low blood pressure had resolved and ordered Hackney to continue his Norvasc prescription. (Docket Entry 94, Ex. B, pp. 46, 122, 123). Hackney received a second refill of Norvasc on October 28, 2004. (ECF 94, Ex. B, p.122).

On November 5, 2004, Hackney was seen by Joseph Burtch, D.O.. Dr. Burtch diagnosed Hackney with hypertension. Dr. Burtch noted that Hackney's hypertension was "fairly controlled" and stable and continued his prescription of 5mg of Norvasc. (ECF 94, Ex. B, p. 44). On December

13, 2004, Hackney was transferred to the Mound Correction Facility. (ECF 94, Ex. B, pp. 42, 5). Registered Nurse Davis gave Hackney an orientation to the Healthcare United and completed a transfer assessment. (Docket Entry 94, Ex. B, pp. 42-3). Davis scheduled Hackney to see a medical service provider on December 20, 2004. (ECF 94, Ex. B, p. 41).

On December 20, 2004, Dr. Kosaraju saw Hackney. She documented the following chronic care conditions: (1) hypertension; (2) hypothyroidism; and (3) hepatitis C. (ECF, Ex. B, p.40). Dr. Kosaraju was aware that Hackney was taking 5mg of Norvasc daily to control his hypertension, and that he had another refill remaining. (ECF 94, Ex. C). Dr. Kosaraju also believed that his hypertension was in a stable condition and fairly controlled. (ECF94, Ex. C). Dr. Kosaraju wrote orders for a chronic care clinic visit to occur in February 2005 and an infectious disease chronic care clinic to occur in May 2005 for Hackney's Hepatitis C. (ECF 94, Ex. B, p.120). She also ordered several lab test to be performed on Hackney. *Id.*

On February 7, 2005, Dr. Kosaraju saw Hackney for his chronic care clinic appointment. She noted that the lab tests she ordered had not occurred. (ECF 94, Ex. B, p.39). Dr. Kosaraju rescheduled the full chronic care evaluation pending the completion of the requested lab exams. (ECF 94, Ex. C). Dr. Kosaraju did not believe that Hackney's hypertension was urgent or emergent at the time of the appointment. (ECF 94, Ex. C). On March 10, 2005 Dr. Kosaraju again saw Hackney, and again noted that the requested lab tests had not been completed. (ECF 94, Ex. B, p. 39). Dr. Kosaraju again reordered the lab tests and rescheduled the chronic care clinic visit. (ECF 94, Ex. B, p.39). Dr. Kosaraju also requested Hackney's earlier medical records and lab tests for review. (ECF 94, Ex. B, p. 119). Dr. Kosaraju believed that Hackney's hypertension was stable and under control. (ECF 94, Ex. C).

4

On March 23, 2005, Dr. Kosaraju performed a chart review addressing Hackney's lab results and scheduled an appointment to evaluate Hackney at the next chronic care clinic. On May 5, 2005, after all of the ordered lab tests were completed, Dr. Kosaraju saw Hackney for a chronic care clinic appointment. (ECF 94, Ex. B, p.38). At that appointment, she diagnosed Hackney with hypertension. Dr. Kosaraju prescribed hydrochlorothiazide to treat Hackney's high blood pressure. (ECF 94, Ex. C). She believed that Hackney's hypertension was mild, and scheduled another chronic care clinic appointment in three months. Dr. Kosaraju performed several chart reviews to examine Hackney's request for Lactaid medication, additional test results, and older medical records. (ECF94, Ex. B, p. 34). During this time, Hackney TSH levels (which, when elevated, indicate hypothyroidism) increased markedly: they went from .040 in May of 2005 to 46.68 in October of 2005. (ECF108, Ex. 7, p 24; Ex. 10). It is unclear from the record whether Hackney received the hydrochlorothiazide prescribed by Dr. Kosaraju.

After reviewing the record, the Court cannot establish which, if any, medications were dispensed to Hackney during his incarceration at the Mound Correctional Facility. There is conflicting evidence regarding which medicines were requested and whether they were received by the facility, and ultimately, Hackney. Significantly, there is evidence of Hackney requesting medication (ECF 108, Ex. 7, p. 23).However, it is unclear how these refill requests were handled. There is evidence that medication requests were faxed to Pharmacorr. (ECF108, Ex. 8, p.1, 3, 5, 12, 16, 17, 20,23, )It is unclear whether Pharmacorr received these requests. (ECF 108, Ex. 6, p. 17). There is evidence that Hackney was taking medications at the time of his death. (ECF 108, Ex. 16, p. 70-73) On July 1, 2005, Dr. Kosaraju stopped working at the Mound Correctional Facility. (ECF 94, Ex. C).

From July 3, 2005 until Hackney's death on December 15, 2005 the only physician at the Mound Correctional Facility was Seetha Vadlamudi, M.D. (ECF 94, Exhibit D). Dr. Vadlamudi was an employee of the Michigan Department of Corrections. *Id*. On August 17, 2005, Dr. Vadlamudi diagnosed Hackney with "poorly controlled hypertension." (ECF 108, Ex. 7, p. 32). Dr. Vadlamudi requested that Hackney's blood pressure be checked weekly for the next month, and that Hackney see him again in one month. *Id*. It is unclear from the record whether these blood pressure checks or follow up appointment ever occurred.

On December 13, 2005 at 10:15 a.m. Hackney was found on the floor of his cell, lying in his own excrement and shaking uncontrollably. (ECF 108, Ex. 13). Hackney was sweating uncontrollably, breathing rapidly, foaming at the mouth, and bleeding from the side of his head. *Id*. At 11:40 a.m., Hackney was transported to the Detroit Receiving Hospital. (ECF 108, Ex. 14). At the Detroit Receiving Hospital, Hackney was treated by Dr. Dimitrijevski. (ECF 108, Ex. 15). Dr. Dimitrijevski was informed that Hackney was prescribed Synthroid and HCTZ. *Id*. The EMS crew that picked up Hackney from the Mound Facility had also administered a drug called Narcan, which is used to reverse the effects of narcotics. *Id*. The EMS crew may have believed that Hackney was suffering from an opiate overdose. *Id*. Drugs screens at the hospital were negative for narcotics. *Id*. Dr. Dimitrijevski determined that Hackney was suffering from uncontrolled hypertension. *Id*. However, Dr. Dimitrijevski left open the possibility that Hackney lost consciousness from an opiate overdose noting that track marks were visible on Hackney's arm and that there are opiates that do not appear on a drug screen. (ECF 96, Ex. 3, p.102-3, 157-8).

Hackney was released from the Detroit Receiving Hospital and returned to the Mound Correctional Facility around 5 p.m. of the same day, December 13, 2005. (ECF 108, Ex. 17).

Hackney was immediately placed in isolation for substance abuse; Hackney was also written up for "opiate overdosage." *Id*. Hackney was kept in isolation without being evaluated by the nurse. *Id*. At 8:00 p.m., Hackney was found unconscious and not breathing in his cell. *Id*. Hackney was brought back to the Detroit Receiving Hospital at some point soon after.

On December 15, 2005, Hackney died at the Detroit Receiving Hospital. (ECF 94, Exhibit B, p. 147). On December 17, 2005, an autopsy was performed by Cheryl Loewe, M.D. (ECF 94, Ex. B, pp. 7-8). Dr. Loewe listed the cause of death on the dearth certificate as hemoperitoneum (blood in the hemoperitoneal cavity) due to liver laceration with rib fractures. (ECF 94, Ex. B, pp. 7-8). On January 19, 2006, Dr. Loewe performed an amended autopsy which revealed the cause of death as myocarditis (inflammation of the heart muscle). (ECF 94, Ex. B, p.9).

## II.

The entry of a summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be genuine, it must contain evidence upon which a jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether there is a genuine issue of material fact, the record is viewed in the light most favorable to the nonmoving party. *Id.* at 255. The moving party has the burden of establishing that there are no genuine issues of material fact and that he is entitled to a judgment as a matter of law. *See, e.g., Darrah v. City of Oak Park*, 255 F.3d 301, 305 (6th Cir.2001). A material fact is "one that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Therefore, a summary judgment must be entered if (1) the submitted evidence in support of the dispositive motion clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law,"

7

*Anderson*, 477 U.S. at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party makes its required showing, then the non-moving party must act affirmatively in order to avoid the entry of a summary judgment. Fed. R. Civ. P. 56(e). Importantly, the presentation of a mere scintilla of supporting evidence is insufficient. *See Anderson*, 477 U.S. at 252.

III.

Federal Rule of Civil Procedure 12(h)(2)(B) provides that "[f]ailure to state a claim upon which relief can be granted . . . may be raised . . . by a motion under Rule 12(c)." Rule 12(c) provides that "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings." In a judgment on the pleadings, a district court must accept the plaintiff's well-pleaded allegations as true and construe each of them in a light that is most favorable to it. *Bennett v. MIS Corp.,* 607 F.3d 1076, 1091 (6th Cir.2010). However, the complaint "must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.,* 520 F.3d 516, 519 (6th Cir.2008) (citation and internal quotation marks omitted).  To survive an application for dismissal, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

IV.

The first amended complaint contains (1) state law claims of gross negligence, and/or wanton and willful misconduct and (2) violation of plaintiff's fourth, fifth, eighth, and fourteenth amendment rights pursuant to 42 U.S.C. § 1983. A stipulation and order was entered dismissing the

state law claims against defendants Kosaraju, Detroit Medical Center, Detroit Receiving Hospital and University Health Center, Dimitrijevski, Orthmeyer, Correctional Medical Services, and Pharmacorr. (ECF 74 and 79).

Kosaraju first submits that she is entitled to summary judgment because the plaintiff is unable to put forth sufficient evidence on which a reasonable jury could conclude that Kosaraju was deliberately indifferent to the plaintiff's medical needs in violation of the Eighth Amendment. Second, Kosaraju submits that she is entitled to judgment on the pleadings with respect to Hackney's claims under the Fourth, Fifth, and Fourteenth amendments. Kosaraju alleges that plaintiff is unable to set forth allegations sufficient to make out a right to relief under the Fourth, Fifth, or Fourteenth amendments. The Court will address these arguments in turn.

## V.

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove that the defendants acted "under color of law" and that their conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or the laws of the United States. *See, e.g. Markva v. Haveman*, 317 F.3d 547, 552 (6th Cir.2003). As applied to prisoners, this constitutional guarantee includes a right to medical care for serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 103-104 (1976). Negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, without a showing of deliberate indifference. *Estelle*, 429 U.S. at 105-6. It is undisputed by the parties that Dr. Kosaraju was a state actor, since she was acting pursuant to a contract between her employer and the State of Michigan.

To demonstrate a deliberate indifference to serious medical needs, the plaintiff's allegations must satisfy two elements, an objective one and a subjective one. *Comstock v. McCrary*, 273 F.3d

9

693, 702 (6th Cir. 2001). First, to satisfy the objective element, the plaintiff must demonstrate that he suffers from a "sufficiently serious" medical need. *Farmer v. Brennan* 511 U.S. 825, 834 (1994) A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir.2004) (internal citations omitted).

Second, to satisfy the subjective element, the plaintiff must demonstrate "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. The subjective element requires that the defendant (1) actually knew of the serious medical need and (2) possessed a sufficiently culpable state of mind in denying medical care. *See, e.g., Miller v. Calhoun County,* 408 F.3d 803, 813 (6th Cir.2005). The Supreme Court has held that "deliberate indifference entails something more than mere negligence. . . [but ]less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, at 835.

Lowe, on behalf of the deceased Hackney, asserts that Kosaraju's treatment violated the Eighth Amendment. With regards to the objective element, the plaintiff submits that Hackney's hypertension qualifies as a serious medical need. Hackney's hypertension had been diagnosed by a doctor. *See, Blackmore*. According to the plaintiff, the medical records during Kosaraju's care demonstrate that Hackney was provided virtually no medical care whatsoever. Kosaraju submits that Hackney's hypertension was not an objectively serious medical need. Rather, Hackney's hypertension was a minor or non-obvious malady.

Viewing the record in the light most favorable to the Plaintiff, the Court finds that a

10

reasonable jury could find that Hackney's hypertension was a serious medical need. Hackney had a history of hypertension that was previously treated and controlled by prescriptions. Additionally, the record presents multiple instances of Hackney requesting refills of his medication. It is not clear from the record when, or if, these refills were processed when he was under Dr. Kosaraju's care. (ECF108, Exhibit 8, p.26).

To fulfill the subjective component, the plaintiff must show that a prison official possessed a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834 (1970). "A defendant possess[es] a sufficiently culpable state of mind when he acts with deliberate indifference." *Carter v. City of Detroit,* 408 F.3d 305, 312 (6th Cir.2005). Kosaraju has submitted a declaration stating that while she found that Hackney suffered hypertension, she found that it was stable and well-controlled. However, a jury could determine that Hackney's Eighth Amendment right to be free from deliberate indifference to his serious medical need was violated. Hackney had been diagnosed with hypertension and treated with a prescription medication regime. Hackney requested his medication and the record is unclear as to what medication or treatment Hackney receive under Kosaraju's care, if any.

For the reasons stated above, Kosaraju's motion for summary judgment on Hackney's Eighth Amendment claims is denied. However, Kosaraju is only liable for the alleged Eighth Amendment violation through her period of care for Hackney, that is, through July 1, 2005.

Kosaraju also claims that she is entitled to a judgement on the pleadings in her favor with respect to Plaintiff's Fourth, Fifth, and Fourteenth Amendment claims. Kosaraju contends that even when taken in the light most favorable to Hackney, the amended complaint fails to make out the elements of a right to relief under any of the aforementioned constitutional amendments. The

Plaintiff failed to respond to this submission in his response brief. The Court finds that the plaintiff has not set forth a claim under the Fourth, Fifth, or Fourteenth Amendment. Therefore, Kosaraju's request for judgement on the pleadings with respect to these claims is granted and these claims are dismissed against this defendant.

VI.

Correctional Medical Services ("CMS") submits that it is entitled to a favorable entry of judgment on the pleadings with respect to Plaintiff's Fourth, Fifth, and Fourteenth Amendment claims.  CMS further submits that it is entitled to an entry of summary judgment on Plaintiff's Eighth Amendment claim.

CMS contends that it is entitled to a judgement in the pleadings because the Plaintiff has failed to set forth sufficient allegations to make out a right to relief under the Fourth, Fifth, or Fourteenth Amendments. Plaintiff failed to respond to this argument. For reasons addressed above, in Kosaraju's similar motion, the Court grants this request.

CMS further submits that it is entitled to an entry of summary judgment on Plaintiff's Eighth Amendment claim because the Plaintiff is unable to put forth sufficient evidence on which a reasonable jury could conclude that the Plaintiff's civil rights were violated as the result of the execution of a policy, practice, or procedure of CMS. Further, CMS contends that it had no personal involvement in the alleged incidents surrounding Hackney's death.

A private entity employed by the state to provide medical services to its prisoners can be sued under § 1983 as one acting "under color of state law." *West v. Atkins*, 487 U.S. 42, 54 (1988). CMS correctly submits that it cannot be held vicariously liable under 42 U.S.C. § 1983 for the conduct of its employees or agents on the basis of respondeat superior. ("CMS, although clearly a state actor and therefore a proper party to this § 1983 action, cannot be held vicariously liable for

12

the action of its agents . . . on a respondeat superior basis. Hence, CMS's liability must also be premised on some policy that caused a deprivation of [plaintiff's] Eighth Amendment rights." *Starcher v. Correctional Medical Systems,* 7 Fed.Appx. 459, 465 (6th Cir.2001) (internal citation omitted).

CMS submits that there is insufficient evidence that it maintained a policy or practice that caused the violation of Hackney's civil rights. For CMS to be liable, the Plaintiff must identify some custom, policy, or procedure that caused a violation of Hackney's Eighth Amendment rights. *See Perez v. Oakland County,* 466 F.3d 416, 430 (6th Cir.2006). The Sixth Circuit has held that:

> there are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (internal citation omitted).

In the present case, the Plaintiff submits that CMS failed to adequately supervise its employees and failed to implement proper policies, procedures, rules and regulations necessary to prevent them from engaging in deliberate indifference to inmates' serious medical needs. To state a municipal liability claim under such an "inaction" theory, Plaintiff must allege: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendants; (3) the defendant's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation. *See, e.g., Doe v. Claiborne County,* 103 F.3d 495, 508 (6th Cir.1996).

In its review of this issue, the Court concludes that there does appear to be a genuine issue

13

of material fact regarding to what extent these defendants adequately monitored their employees while they were responsible for Hackney's medical care at the Mound Correctional Facility from December of 2004 to July of 2005. Further, there is a question of material facts as to the extent to which CMS's policies and customs were the "moving force" behind the injuries suffered by Hackney. Therefore, CMS's motion for summary judgment will be denied.

VII.

In light of the foregoing, Kosaraju's motion is granted in part and denied in part. (ECF 94). Kosaraju's motion for summary judgment with respect to the Eighth Amendment claims is denied. However, Kosaraju is only liable for the alleged Eighth Amended claims through her period of care for Hackney, that is, through July 1, 2005. Kosaraju's motion for judgment on the pleadings with respect to Hackney's Fourth, Fifth, and Fourteenth Amendment claims is granted.

Furthermore, Correctional Medical Services's motion is granted in part and denied in part. (ECF 97). The motion for judgment on the pleadings with respect to Hackney's Fourth, Fifth, and Fourteenth Amendment claims is granted. The motion for summary judgment with respect to the Eighth Amendment claims is denied.

IT IS SO ORDERED.

Date: March 13, 2012                                  s/Julian Abele Cook, Jr.
                                                     JULIAN ABELE COOK, JR.
                                                     U.S. District Court Judge

14

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 13, 2012.

                                    s/ Kay Doaks
                                    Case Manager